## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW VAN WINKLE, Derivatively on Behalf of THE ESTÉE LAUDER COMPANIES INC., | |
| Plaintiff, | Case No. |
| v. | |
| RONALD S. LAUDER, FABRIZIO FREDA, JANE LAUDER, WILLIAM P. LAUDER, CARL HANEY, MICHAEL O'HARE, JANE HERTZMARK HUDIS, LEONARD A. LAUDER, TRACEY T. TRAVIS, JENNIFER HYMAN, BARRY S. STERNLICHT, CHARLENE BARSHEFSKY, LYNN FORESTER DE ROTHSCHILD, PAUL J. FRIBOURG, RICHARD F. ZANNINO, JENNIFER TEJADA, ARTURO NUÑEZ, ANGELA WEI DONG, WEI SUN CHRISTIANSON, and ROSE MARIE BRAVO, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |
| Defendants, | |
| -and- | |
| THE ESTÉE LAUDER COMPANIES INC., a Delaware Corporation, | |
| Nominal Defendant. | |

Plaintiff Matthew Van Winkle ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for breach of fiduciary duty and unjust enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This Complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder derivative action on behalf of nominal defendant The Estée Lauder Companies Inc. ("Estée Lauder" or the "Company") against certain of its officers and directors for breach of fiduciary duty, unjust enrichment, and violations of law.  These wrongs resulted in significant damages to Estée Lauder's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      Estée Lauder is an American multinational cosmetics company.  It manufacturers and markets makeup, skincare, perfume, and hair care products.  The Company is based in New York City and is the second largest cosmetics company in the world.  The Company was founded by its namesake, Mrs. Estée Lauder, and her husband, Joseph Lauder, nearly eighty years ago in 1946.  The Lauder family still controls the Company.  In particular, the Lauder family controls 84% of the stockholder voting power, defendant William P. Lauder ("W. Lauder") (Estée's grandson) is the Executive Chairman and a director of the Company, and two other members of the Lauder family sit on Estée Lauder's Board of Directors (the "Board").

3.      Estée Lauder's operations are heavily dependent on mainland China, specifically, the Hainan Province.[1]  Hainan is the second largest cosmetics importer province in China and has the world's biggest duty-free mall, making the region a key location for Estée Lauder.  In fact, in February 2022, the Company announced an increased presence across all of China, including Hainan.

---

[1] Hainan is an island province of China with a population of 9.2 million people and is a tourist destination.

4.     Starting in 2022, at the latest, the Company faced significant headwinds[2] from the Coronavirus Disease of 2019 ("COVID-19") pandemic restrictions in China and inflationary pressures that were impacting the cost of goods, yet the Company was still performing well in China.  The Individual Defendants (as defined herein) falsely assured investors that sales growth within the Company's Asia travel retail segment was driven by sustainable underlying demand for Estée Lauder's products and the strength of its brand.  In truth, Estée Lauder had been supplying and growing dependent on a pervasive, prohibited gray market resale industry in China, called daigou,[3] to drive sales within its Asia travel retail segment—an unsustainable practice that the Individual Defendants concealed from the public.  Critically, in 2019, Estée Lauder publicly denied its use of daigou to inflate sales.  Nevertheless, Estée Lauder's pressure to grow led it to become reliant on the daigou resale pipeline as it pumped massive amounts of product into the gray market via its travel retail channels.  The Company was using daigou to offload product during the COVID-19 pandemic when sales were slumping.  For a time, Estée Lauder's surreptitious use of the daigou gray market had its intended effect and allowed the Company to report surprisingly strong travel retail sales given a global pandemic.  In fact, the Individual Defendants raised the Company's financial guidance for fiscal year 2022 and fiscal year 2023.[4]

5.     However, the Individual Defendants' ability to rely on daigou to prop up sales figures inevitably came to an abrupt end.  First, on July 1, 2021, Estée Lauder's largest customer, China Duty Free Group—the number one travel retailer in China, which generated 14% of the

---

[2] A headwind is a term used by the Company to describe conditions that impede or inhibit progress.

[3] Daigou directly translates from its Chinese origin to English as "buy on behalf of."  Daigou are resellers that purchase luxury goods at reduced, duty-free prices and resell them to end-consumers in mainland China at a price below retail but high enough to profit.

[4] The Company's fiscal year ends on June 30 of each reporting year, i.e., fiscal year 2022 ends on June 30, 2022.

Company's net sales—pledged to eradicate all daigou activity.  Then, on January 1, 2022, Chinese regulators implemented severe crackdowns on all daigou activity, effectively putting an end to Estée Lauder's ability to rely on the gray market as a revenue stream.  Instead of disclosing the truth—that the Company had become over-reliant on daigou activity—Company insiders dumped their stock over an almost two-year period.

6.      On February 3, 2022, the start of the relevant period, the Individual Defendants raised the Company's outlook for key metrics for fiscal 2022.  Shortly after, Company insiders began selling their Estée Lauder stock.  The next day, on February 4, 2022, defendant Michael O'Hare ("O'Hare"), Executive Vice President, Global Human Resources, sold 16,389 shares of his personally held Company stock for proceeds of over $5 million.  Then, on February 10, 2022, defendant Ronald S. Lauder ("R. Lauder") (Estée's son), a member of the Board, sold 700,000 shares of his personally held Company stock for proceeds of nearly $215 million.  Defendants O'Hare, R. Lauder, Carl Haney ("Haney"), Executive Vice President, Global Research Product and Innovation Officer, and Fabrizio Freda ("Freda"), former President, Chief Executive Officer ("CEO") and a director, collectively sold over a quarter of a billion dollars' worth of their personally held Company stock within a month of the unrealistic February 3, 2022, disclosure.

7.      On August 18, 2022, the Company announced its fiscal year 2022 results and a positive fiscal year 2023 outlook.  The Company's key metrics were at the low end of the May 3, 2022, outlook.  However, the Individual Defendants had no basis to issue such a positive 2023 outlook.

8.      After the fiscal year 2023 outlook was released, several of the Company's officers and directors took advantage of the Company's inflated stock price.  Just a week later, on August 25, 2022, defendants Freda, Jane Hertzmark Hudis ("Hudis"), Executive Group President, and

- 4 -

director Barry S. Sternlicht ("Sternlicht") sold 19,709 shares, 6,667 shares, and 4,736 shares of their personally held Company stock and for approximately $5.2 million, $1.8 million, and $1.3 million in proceeds, respectively.

9.      Less than three months later, on November 2, 2022, the Company announced it was lowering its full year forecast for fiscal year 2023.  On this news, Estée Lauder's market capitalization plunged 8.13%, or $16.80 per share, on November 2, 2022, to close at $189.96 per share compared to the closing price of $206.76 per share on November 1, 2022, over $83.13 per share lower than the price at which defendants Freda, Hudis, and Sternlicht sold their stock, erasing over $3.8 billion in market capitalization.

10.     Despite this disclosure, the full truth had yet to emerge.  While omitting the daigou crackdowns, Individual Defendants reported declining sales figures, claiming that any such softness in sales was simply a "*near-term temporary pause*" that did "*not diminish [Estée Lauder's] deep conviction in Hainan for the long term*."  Defendant Freda took that opportunity to sell more of his Company stock.  Brazenly, defendant Freda took one last chance to dump his stock the day before the Company again lowered its fiscal 2023 outlook.  On February 1, 2023, defendant Freda sold 6,831 shares of his personally held Company stock for approximately $1.9 million in proceeds.

11.     Then, on February 2, 2023, the Company announced it was again lowering its fiscal year forecast for 2023.  In the wake of this disclosure, Estée Lauder's stock plunged more than 6.99%, or $19.63 per share, on February 6, 2023, to close at $261.17 per share compared to the closing price of $280.80 per share on February 2, 2023, over $13.83 per share lower than the price at which defendant Freda sold his stock, erasing over $4.5 billion in market capitalization.  Yet,

even the revised forecasts did not provide the full extent of the Company's over-reliance on daigou

activity, which kept the Company's stock price inflated.

12.     On May 3, 2023, Estée Lauder announced it was lowering its fiscal year forecast

for 2023 for the third time.  Originally, the Company forecasted: (i) net sales to increase between

3% and 5% versus the prior-year period; (ii) diluted net earnings per common share to be between

$7.11 and $7.33; and (iii) adjusted diluted earnings per common share to increase between 5% and

7%.  By May 3, 2023, the Company forecasted: (i) net sales to decrease between 12% and 10%

versus the prior-year period; (ii) diluted net earnings per common share to be between $2.62 and

$2.76; and (iii) adjusted diluted earnings per common share to decrease between 51% and 50%.

13.     In the wake of the May 3, 2023, disclosure, Estée Lauder's stock plunged more than

17.34%, or $42.52 per share on May 3, 2023, to close at $202.70 per share compared to the

previous trading day's closing of $245.22 per share, erasing over $9.8 billion in market

capitalization.  Again, the full truth had not emerged because the Individual Defendants refused to

disclose the Company's reliance on daigou activity and that sales were declining because China

was cracking down on such activities.  On May 3, 2023, the Individual Defendants again reassured

investors that "***the challenges in travel retail are abating with time***."  Defendant Hudis took

advantage of that adverse material nonpublic information and on May 11 and May 16, 2023, sold

another 53,180 shares for $10.7 million in proceeds.

14.     However, with Estée Lauder's ability to rely on daigou sales gone for good and

analysts asking questions about the reasons for the travel retail segment's inexplicable poor

performance, the Individual Defendants were forced to admit, on August 18, 2023, that "retail

sales trends deteriorated and turned steeply negative, ***following the enforcement actions to control***

***daigou activity***."  That same day, the Company announced disastrous financial results for fiscal

2023.  Net sales decreased 10% versus the prior year; diluted net earnings per common share was $2.79, down from $6.55 in the prior year; and adjusted diluted earnings per common share decreased 49%.

15.     On this news, Estée Lauder's market capitalization plunged more than 7.69%, or $12.47 per share, on August 22, 2023, to close at $149.59 per share compared to the closing price of $162.06 per share on August 17, 2023, erasing nearly $2.9 billion in market capitalization in just two days.  Despite this disclosure, the full truth had yet to be revealed.  Defendants Jane Lauder ("J. Lauder"), Estée Lauder's Executive Vice President of Enterprise Marketing, Chief Data Officer, and a director, and Charlene Barshefsky ("Barshefsky"), a Company director, took one last opportunity to sell their stock.  On August 23, 2023, defendants J. Lauder and Barshefsky sold 12,661 and 1,796 shares for approximately $1.9 million and $272,866 in proceeds, respectively.

16.     After the Company insiders sold over $295 million of their Estée Lauder stock, the public learned of the Company's over-reliance on daigou activity, which led to decreases in travel retail sales in Hainan once China began cracking down on the practice.  On November 1, 2023, the Individual Defendants disclosed that its travel retail sales downturn was "***primarily***" caused by government and retailer crackdowns on "***unstructured***" gray market activity.  Investors were shocked.  For example, on November 1, 2023, Jefferies Research reported that the Company's poor quarterly and full year financial outlook "both proved to be far worse than models" and as a result of the disclosures understood that the "[d]aigou portion was a meaningful part of the [travel retail business]."  On this news, Estée Lauder's market capitalization plunged approximately 19%, or $24.36 per share, on November 1, 2023, to close at $104.51 per share compared to the closing price of $128.87 per share on October 31, 2023, erasing nearly $5.7 billion in market capitalization in just one day.

17.     Accordingly, the Insider Selling Defendants (as defined herein) avoided massive losses.  In total, the Lauder family and other Company insiders, armed with adverse material, nonpublic information concerning the true state of Estée Lauder's operations, sold over $295 million worth of their personally held Company stock at opportune times while it was artificially inflated.  Notably, the Insider Selling Defendants' sales were at an average price of $249 per share, nearly $145 (138%) higher than the November 1, 2023, closing price of $104.51 per share.

18.     Further, as a direct result of this unlawful course of conduct, Estée Lauder is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Southern District of New York on behalf of investors who purchased Estée Lauder's shares (the "Securities Class Action").  The court in the Securities Class Action denied a motion to dismiss in its entirety and discovery is underway.  As a result, the Company's damages continue to grow because of the Individual Defendants' wrongdoing.

## JURISDICTION AND VENUE

19.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Estée Lauder maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the

transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Estée Lauder, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **THE PARTIES**

**Plaintiff**

22.     Plaintiff was a stockholder of Estée Lauder at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Estée Lauder stockholder.  Plaintiff is a citizen of Washington.

**Nominal Defendant**

23.     Nominal defendant Estée Lauder is a Delaware corporation with principal executive offices located at 767 Fifth Avenue, New York, New York.  Accordingly, Estée Lauder is a citizen of Delaware and New York.  Estée Lauder is a beauty and cosmetics company that manufactures and sells a variety of skin care, makeup, fragrance, and hair care products globally. The Company's products are sold in approximately 150 countries and territories under a number of brand names including Estée Lauder, Clinique, Origins, La Mer, Aveda, TOM FORD, and The Ordinary.  Estée Lauder has been controlled by the Lauder family since it was founded in 1946, and members of the Lauder family beneficially own shares of Class A and Class B common stock representing approximately 84% of the outstanding voting power as of August 12, 2024.  Estée Lauder had approximately 62,000 employees worldwide as of June 30, 2024.

**Defendants**

24.    Defendant R. Lauder has been Chairman of Clinique Laboratories, LLC since 1987. He was also an Estée Lauder director from November 2016 to January 2025, from 1988 to July 2009, and from 1968 to 1986; the Chairman of Estée Lauder International, Inc. from 1987 to 2002; and held various positions of increasing responsibility from 1964 to 1968.  While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant R. Lauder sold 700,000 shares of his personally held Company stock for $214,956,000 in proceeds. Estée Lauder paid defendant R. Lauder the following compensation as a director:

| Fiscal Year | Annual Base Salary | Bonus | Total |
|---|---|---|---|
| 2023 | $650,000 | $179,150 | $829,150 |
| 2022 | $650,000 | $470,850 | $1,120,850 |

Defendant R. Lauder is a citizen of New York.

25.    Defendant Freda has been a Special Advisor to Estée Lauder since January 2025. He was also Estée Lauder's CEO and a director from July 2009 to January 2025; President from March 2008 to January 2025; and Chief Operating Officer from March 2008 to July 2009. Defendant Freda is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant Freda sold 166,164 shares of his personally held Company stock for $44,489,150.65 in proceeds.  Estée Lauder paid defendant Freda the following compensation as an executive and a director:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2023 | $2,100,000 | $10,416,576 | $5,208,432 | $2,715,450 | $1,057,600 | $313,186 | $21,811,244 |
| 2022 | $2,100,000 | $9,883,468 | $4,941,572 | $7,013,150 | $974,688 | $567,178 | $25,480,056 |

Defendant Freda is a citizen of New York.

26.     Defendant Hudis has been Estée Lauder's Executive Group President since at least August 2020.   Defendant Hudis was also Estée Lauder's Executive Group President Group President from at least August 2011 to at least August 2020.   While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant Hudis sold 68,103 shares of her personally held Company stock for $14,459,469.10 in proceeds.  Estée Lauder paid defendant Hudis the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|-------------------------|------------------------|-------|
| 2023 | $1,344,000 | $3,038,476 | $1,519,466 | $957,950 | $316,629 | $62,026 | $7,238,547 |
| 2022 | $1,305,000 | $6,383,345 | $1,441,848 | $2,289,400 | $157,387 | $68,737 | $11,645,717 |

Defendant Hudis is a citizen of New York.

27.     Defendant J. Lauder has been Estée Lauder's Executive Vice President, Enterprise Marketing and Chief Data Officer since July 2020, and a director since July 2009.  Defendant J. Lauder was also Estée Lauder's Global Brand President, Clinique from April 2014 to July 2020; Global President, General Manager of the Origins, Ojon and Darphin brands from July 2010 to April 2014; Senior Vice President/General Manager of Origins from July 2008 to July 2010; and Senior Vice President, Global Marketing for Clinique from July 2006 to July 2008.   While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant J. Lauder sold 32,693 shares of her personally held Company stock for $6,848,712.42 in proceeds.  Estée Lauder paid defendant J. Lauder the following compensation as an executive and a director:

| Year | Salary | Bonus | Equity-Based Compensation | Total |
|------|--------|-------|---------------------------|-------|
| 2023 | $970,000 | $447,950 | $2,180,000 | $3,597,950 |
| 2022 | $930,000 | $1,122,400 | $1,950,000 | $4,002,400 |

Defendant J. Lauder is a citizen of Florida.

28.    Defendant Haney has been Estée Lauder's Executive Vice President, Global Research Product and Innovation Officer since January 2012.  While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant Haney sold 24,117 shares of his personally held Company stock for $6,129,143.65 in proceeds.  Defendant Haney is a citizen of New York.

29.    Defendant O'Hare was Estée Lauder's Executive Vice President, and Chief Human Resources Officer from August 2013 to April 2025.  While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant O'Hare sold 18,507 shares of his personally held Company stock for $5,601,938.76 in proceeds.  Defendant O'Hare is a citizen of New York.

30.    Defendant Jennifer Hyman ("Hyman") has been an Estée Lauder director since April 2018.  Defendant Hyman has been a member of Estée Lauder's Audit Committee since at least September 2021.  While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant Hyman sold 5,234 shares of her personally held Company stock for $1,396.847.25 in proceeds.   Estée Lauder paid defendant Hyman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $112,000 | $74,999 | $99,927 | $286,926 |
| 2022 | $112,000 | $75,000 | $99,911 | $286,911 |

Defendant Hyman is a citizen of New York.

31.    Defendant Sternlicht has been an Estée Lauder director since July 2004.  While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant Sternlicht sold 4,736 shares of his personally held Company stock for $1,299,136.56 in proceeds.  Estée Lauder paid defendant Sternlicht the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $108,000 | $74,999 | $99,927 | $282,926 |
| 2022 | $108,000 | $75,000 | $99,911 | $282,911 |

Defendant Sternlicht is a citizen of Florida.

32.    Defendant Barshefsky has been Estée Lauder's Presiding Director since November 2021 and a director since at least July 2001.  While in possession of material, nonpublic information concerning Estée Lauder's true business health, defendant Barshefky sold 2,954 shares of her personally held Company stock for $549,443 in proceeds.  Estée Lauder paid defendant Barshefsky the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Change in Pension Value | Total |
|---|---|---|---|---|---|
| 2023 | $138,000 | $74,999 | $99,927 | $69,088 | $382,014 |
| 2022 | $134,250 | $75,000 | $99,911 | $21,133 | $330,294 |

Defendant Barshefsky is a citizen of Washington, D.C.

33.    Defendant Leonard A. Lauder ("L. Lauder") has been Estée Lauder's Chairman Emeritus since March 2009.  He served as director from 1958 to November 2023; Chairman of the Board from 1995 to March 2009; CEO from 1982 to 1995; President 1972 to 1995; and has held various positions of increasing responsibility from 1958 to 1972.  Estée Lauder paid defendant L. Lauder the following compensation as a director:

| Year | Salary | Total |
|---|---|---|
| 2023 | $1,800,000 | $1,800,000 |
| 2022 | $1,800,000 | $1,800,000 |

Defendant L. Lauder is a citizen of Florida.

34.    Defendant Tracey T. Travis ("Travis") has been Estée Lauder's Executive Vice President, Senior Adviser since November 2024.  Defendant Travis was also Estée Lauder's Executive Vice President and Chief Financial Officer from August 2012 to November 2024.

Defendant Travis is named as a defendant in a related securities action that alleges she violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Estée Lauder paid defendant Travis the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|------------------------|-------|
| 2023 | $1,195,000 | $4,050,644 | $2,025,632 | $813,450 | $169,409 | $77,174 | $8,331,309 |
| 2022 | $1,150,000 | $8,841,998 | $1,920,773 | $2,061,850 | $84,388 | $35,927 | $14,094,936 |

Defendant Travis is a citizen of New York.

35.     Defendant W. Lauder has been Estée Lauder's Executive Chairman of the Board since July 2009 and a director since 1996.  Defendant W. Lauder was also Estée Lauder's CEO from July 2004 to July 2009; President from July 2004 to March 2008; Chief Operating Officer from January 2003 to July 2004; Group President from July 2001 to January 2003; President, Clinique Laboratories, LLC from 1998 to 2001; and has held various positions of increasing responsibility from 1986 to 1998.  Estée Lauder paid defendant W. Lauder the following compensation as an executive and a director:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|------------------------|-------|
| 2023 | $1,575,000 | $2,416,701 | $1,208,360 | $1,666,450 | $854,016 | $83,466 | $7,803,993 |
| 2022 | $1,575,000 | $2,283,182 | $1,141,841 | $4,348,150 | $200,014 | $53,809 | $9,601,996 |

Defendant W. Lauder is a citizen of New York.

36.     Defendant Lynn Forester de Rothschild ("de Rothschild") has been an Estée Lauder director since at least December 2000.  Estée Lauder paid defendant de Rothschild the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|-------------------|--------------|---------------|-------|
| 2023 | $108,000 | $74,999 | $99,927 | $282,926 |
| 2022 | $108,000 | $75,000 | $99,911 | $282,911 |

Defendant de Rothschild is a citizen of England.

37.    Defendant Paul J. Fribourg ("Fribourg") has been an Estée Lauder director since April 2006.  He has been a member of Estée Lauder's Audit Committee since at least September 2021.  Estée Lauder paid defendant Fribourg the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $135,000 | $74,999 | $99,927 | $309,926 |
| 2022 | $131,250 | $75,000 | $99,911 | $306,161 |

Defendant Fribourg is a citizen of New York.

38.    Defendant Richard F. Zannino ("Zannino") has been an Estée Lauder director since January 2010.  Defendant Zannino has been the Chair and a member of Estée Lauder's Audit Committee since at least September 2021.  Estée Lauder paid defendant Zannino the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $139,000 | $74,999 | $99,927 | $313,926 |
| 2022 | $143,000 | $75,000 | $99,911 | $317,911 |

Defendant Zannino is a citizen of Connecticut.

39.    Defendant Jennifer Tejada ("Tejada") has been an Estée Lauder director since April 2018.  She was a member of Estée Lauder's Audit Committee from at least September 2021 to November 2022.  Estée Lauder paid defendant Tejada the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $109,000 | $74,999 | $99,927 | $283,926 |
| 2022 | $112,000 | $75,000 | $99,911 | $286,911 |

Defendant Tejada is a citizen of California.

40.    Defendant Arturo Nuñez ("Nuñez") has been an Estée Lauder director since April 2022.  He has been a member of Estée Lauder's Audit Committee since April 2022.  Estée Lauder paid defendant Nuñez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $112,000 | $374,999 | $99,927 | $586,926 |
| 2022 | $28,000 | $0 | $0 | $28,000 |

Defendant Nuñez is a citizen of Florida.

41.    Defendant Angela Wei Dong ("Dong") has been an Estée Lauder director since July 2022.  Defendant Dong has been a member of Estée Lauder's Audit Committee since July 2022.  Estée Lauder paid defendant Dong the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $112,000 | $74,999 | $99,927 | $286,926 |

Defendant Dong is a citizen of the People's Republic of China.

42.    Defendant Wei Sun Christianson ("Christianson") was an Estée Lauder director from March 2011 to November 2023.  Estée Lauder paid defendant Christianson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $123,000 | $74,999 | $99,927 | $297,926 |
| 2022 | $119,250 | $75,000 | $99,911 | $294,161 |

Defendant Christianson is a citizen of the People's Republic of China.

43.    Defendant Rose Marie Bravo ("Bravo") was an Estée Lauder director from April 2003 to November 2022.  Estée Lauder paid defendant Bravo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2023 | $25,000 | - | - | $25,000 |
| 2022 | $102,000 | $75,000 | $99,911 | $276,911 |

Defendant Bravo is a citizen of Florida.

44.    The defendants identified in ¶¶25-29, 34-25 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶24-25, 27, 30-33, 35-43 are referred to herein as the

"Director Defendants."  The defendants identified in ¶¶30, 37-41 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶24-32 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶24-43 are referred to herein as the "Individual Defendants."

**Relevant Non-Parties**

45.    Non-party Gary M. Lauder ("G. Lauder") has been an Estée Lauder director since November 2023.

46.    Non-party Stéphane de La Faverie ("de La Faverie") has been Estée Lauder's President, CEO, and a director since January 2025.  Non-party de La Faverie was also Estée Lauder's Executive Group President from September 2022 to January 2025; Group President, The Estée Lauder Companies and Global Brand President, Estée Lauder and AERIN Beauty from July 2020 to August 2022; Global President, Estée Lauder from July 2016 to June 2020; Global President, Origins and Darphin from January 2016 to June 2016; Senior Vice President and General Manager, Origins, Ojon and Darphin from April 2014 to December 2015; and Senior Vice President and General Manager, ADF Global from January 2011 to March 2014.

47.    Non-party Eric Zinterhofer ("Zinterhofer") has been an Estée Lauder director since January 2025.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

48.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Estée Lauder and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Estée Lauder in a fair, just, honest, and equitable manner.  The Individual Defendants were and are

required to act in furtherance of the best interests of Estée Lauder and not in furtherance of their personal interest or benefit.

49.     To discharge their duties, the officers and directors of Estée Lauder were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Estée Lauder were required to, among other things:

(a)     disclose material adverse information concerning the true nature of the Company's over-reliance on daigou activity along with how crackdowns on daigou activity would materially and negatively affected the Company's travel retail business;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)     remain informed as to how Estée Lauder conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties of the Audit Committee Defendants**

50.     In addition to these duties, under its Charter in effect since May 17, 2019, the Audit Committee Defendants owed specific duties to Estée Lauder to assist the Board in overseeing the integrity of the Company's financial statements and risk.  Moreover, the Audit Committee's Charter provides that the Audit Committee Defendants have "full authority and unrestricted access to the resources, information, and personnel necessary to fulfill its responsibilities.  It has the power

to conduct or authorize investigations into any matters within the Committee's scope of responsibilities."

51.     The Audit Committee Charter expressly required the Audit Committee Defendants to "[r]eview and discuss with management … and the Board … any significant risks or exposures and the steps management has taken to monitor and control such exposures."  According to the Audit Committee Charter, the Audit Committee Defendants are required to review earnings press releases and the Company's internal controls to protect against significant deficiencies in financial data:

D.   Earnings Review

***Discuss with management earnings press releases (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information) as well as financial information and earnings guidance provided to analysts and rating agencies***. This discussion may be done generally, such as a discussion of the types of information to be disclosed and the type of presentation to be made. The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

E.   Other Matters

1.   ***In connection with the quarterly certifications by the Chief Executive Officer and Chief Financial Officer ("CFO"), receive reports from such officers regarding (i) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data; (ii) material weaknesses in internal controls***; and (iii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

52.     The Audit Committee Defendants failed to ensure that the Company's statements were accurate.  The Audit Committee Defendants either knew or should have known that the Company's statements concerning travel retail were materially false and misleading.  As a result of the undisclosed issues, the Audit Committee Defendants knew or should have known that the

Company's over-reliance on daigou activity was not disclosed to the public and thus inflated Estée Lauder's stock price.

**Insider Trading Prohibitions**

53.     The Company's Code of Conduct prohibits selling Company stock while in possession of material, nonpublic information.  Additionally, the Company's Insider Trading Policy prohibits employees, including executive officers, and members of the Board from trading in Company securities while in possession of material, nonpublic information about the Company.

**Breaches of Duties**

54.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Estée Lauder, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

55.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in making materially false and misleading statements, improper practices that wasted the Company's assets, and caused Estée Lauder to incur substantial damage.

56.     The Individual Defendants, because of their positions of control and authority as officers or directors of Estée Lauder, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Estée Lauder has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

58.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Estée Lauder, regarding the Individual Defendants' management of Estée Lauder's operations and failure to disclose adverse material nonpublic information concerning Estée Lauder's over-reliance on gray market sales which negatively impacted revenues as China cracked down on daigou activity; (ii) facilitate the Insider Selling Defendants' illicit sale of over $295 million of  their personally held Company shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Estée Lauder and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

59.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning the Company's over-reliance on gray market sales and inevitable decline in revenue.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly make materially false and misleading statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE LAUDER FAMILY FOUNDS AND CONTROLS ESTÉE LAUDER

**The Lauder Family's Influence and Wealth Has Grown with the Company**

62.     Mrs. Estée Lauder, who was born and raised in New York City, and her husband, Joseph Lauder, founded the Company in 1946.  They started the business with four skin-care products.  In the 1950s, Estée created Youth-Dew, a bath oil that doubled as a perfume.  This innovation transformed the Company into a multimillion-dollar business.

63.     Estée oversaw the creation of five additional brands—Aramis, Clinique, Prescriptives, LAB Series, and Origins.  Estée received the French Legion of Honour and supported numerous civic and cultural programs and other charitable causes, including the restoration of the Palace of Versailles and the building of several playgrounds in New York City's Central Park.

64.    According to the Company's website, "[t]he only thing more important to Estée than the Company was her family, and she was thrilled that her children and grandchildren joined the family business."  Estée retired in 1995 and passed away in 2004.

65.    Estée and Joseph Lauder had two sons, defendants L. Lauder and R. Lauder. According to the Company's website, "the family business was often the topic of discussion at the dinner table."  Seven decades since its creation, second and third generation members of the Lauder family are "at the heart of the publicly traded, family-controlled company, actively engaged in its leadership."  The Company is now "largely run" by defendants L. Lauder, R. Lauder, and their children, including defendants J. Lauder, W. Lauder, and non-party G. Lauder.

66.    The Lauder family's influence has only grown since Estée's children and grandchildren took the Company's reigns.  Today, Estée Lauder owns at least twenty-five additional brands in over 150 countries, including MAC, Clinique, Origins, Bobbi Brown, and Smashbox.  Each Lauder family member is involved with numerous philanthropic causes, in addition to their collective support for the Breast Cancer Research Foundation, which was founded by the late Evelyn H. Lauder (defendant L. Lauder's late wife).

67.    According to *Business Insider*, the Lauders have become "society fixtures, and were friends with the Kennedys, British Royalty, and world leaders."  Defendant L. Lauder is Chairman Emeritus of the Whitney Museum, Emeritus Trustee of the University of Pennsylvania, and member of the President's Council of Memorial Sloan-Kettering Hospital, among many others.  Defendant R. Lauder is the benefactor of the Neue Galerie New York, Chairman of the Jewish National Fund, and President of the World Jewish Congress.  Both he and his brother also donate heavily to the Lauder Foundation at The Wharton School.  Aerin Lauder, sister to defendant J. Lauder, is a regular at society events, fashion shows, and premieres.  As a result of the

Company's success and the Lauder family's influence in society, the Lauder family has the ability to make or break anyone who either agrees with them or defies them.

**The Lauder Family's Established Control of the Company**

68.    The Lauder family uses a dual class stock structure to maintain control of the Company.  Holders of Class A common stock have one vote per share and holders of Class B common stock (limited to members of the Lauder family and related entities) have ten votes per share.  Members of the Lauder family beneficially own shares of Class A and Class B common stock representing approximately 84% of the outstanding voting power as of August 12, 2024.  As a result, Estée Lauder is a "controlled company" within the meaning of the New York Stock Exchange rules.

69.    Defendants L. Lauder, R. Lauder, W. Lauder, and non-party G. Lauder, each individually and as Trustees of various trusts, along with Aerin Lauder as Trustee, defendant J. Lauder as Trustee, Joel S. Ehrenkranz[5] as Trustee, and LAL Family Partners L.P. ("LALFP")[6] are parties to a Stockholders' Agreement.  The Stockholders' Agreement requires the parties to vote in favor of up to four director nominees designated by members of the family.  The right of each of defendant L. Lauder (or one of his sons) and R. Lauder (or one of his daughters) to be nominated will exist so long as he (including his descendants) beneficially owns shares of common stock with at least 5% of the total voting power of the Company.  The Stockholders' Agreement also contains

---

[5] Joel S. Ehrenkranz is a close friend to the Lauder family.  Mr. Ehrenkranz co-founded the law firm of Ehrenkranz & Ehrenkranz LLP in 1966 and currently serves as a Senior Partner of Ehrenkranz & Ehrenkranz LLP and Ehrenkranz Partners L.P., a wealth advisory firm.  He is Vice Chair of the Board of Trustees of Mount Sinai Medical Center and a trustee of the Lincoln Center for the Performing Arts and of the Museum of Modern Art.  He is a life Trustee of the New York University School of Law and an honorary Trustee of the Whitney Museum of American Art.  He was previously the president of the Whitney Museum of American Art, the Archives of American Art, and the Jewish Communal Fund of New York.  He is a member of the Council on Foreign Relations.

[6] LAL Family Corporation ("LALFC") is the sole general partner of LALFP and may be deemed to be the beneficial owner of the shares of Class B common stock owned directly by LALFP.  Both LALFC and LALFP are beneficially owned by the Leonard A. Lauder family.

a "sunset provision."  Under this provision, the Stockholders' Agreement will terminate upon the occurrence of certain specified events, including the transfer of shares of common stock by a party to the Stockholders' Agreement that causes all parties thereto immediately after such transaction to own beneficially in the aggregate shares having less than 10% of the total voting power of the Company.

70.    In the case of private sales of stock, each stockholder who is a party to the Stockholders' Agreement (the "Offering Stockholder") has granted to each other party (the "Offeree") a right of first offer to purchase shares of Class A common stock that the Offering Stockholder intends to sell to a person (or group of persons) who is not a Lauder family member. Each Offeree has the opportunity to purchase the Offeree's pro rata portion of the shares to be offered by the Offering Stockholder, as well as additional shares not purchased by other Offerees. Needless to say, it is impossible for non-Lauder family directors to remove Lauder family members from the Board without the Lauders' permission.  Additionally, the Company's most recent Proxy Statement on Form DEF 14A filed with the SEC on September 19, 2024, admits that Estée Lauder is a controlled company.

## TRAVEL RETAIL IN CHINA AND THE GRAY MARKET

### The Company Becomes Reliant on Daigou Activity

71.    Estée Lauder's travel retail business segment "covers the world of duty-free environments including airports, downtown locations, airlines, cruises, and border shops."  Since products sold in these locations are purchased for international use, they are exempt from import and sales taxes.  The travel retail channels are intended to reinforce the Company's prestigious brand image through the luxury of overseas travel.

72.    In recent years, travel retail has become one of Estée Lauder's fastest growing and most profitable channels.  The percentage of Estée Lauder's revenue derived from travel retail has significantly increased over time from 6% in 2009, to 18% in 2018, to 28% in 2021.

73.    Travel retail at Estée Lauder is divided into three geographic regions ostensibly based on where sales occur: Asia Pacific ("APAC"), Europe, Middle East, and Africa ("EMEA"), and The Americas.  Since 2019, Estée Lauder has grouped and reported all global travel retail sales in its EMEA region regardless of where the sale took place across the globe.  The Company's 2021-2023 Annual Forms 10-K relegate this significant fact to a footnote.[7]  By grouping travel retail worldwide into the EMEA region sales reporting, Estée Lauder was able to obscure what region or subregion was actually driving its travel retail sales.[8]

74.    Consumer demand for luxury beauty goods is particularly high in China.  However, the price of luxury beauty products is significantly higher in China as compared to other countries worldwide.  Accordingly, the ability to purchase expensive, luxury beauty products in duty-free (and thus tax free) shops appeals greatly to Chinese consumers.  As a result, Estée Lauder became focused on selling to Chinese end-consumers through its travel retail channels.  Despite the Company's opaque travel retail reporting, China was far and away the most important end-consumer location amongst the Company's travel retail business segment.  Investors understood

---

[7] Estée Lauder's 2022 and 2023 Annual Forms 10-K state: "The net sales from the Company's travel retail business are included in Europe, the Middle East & Africa region, with the exception of Dr. Jart+ in the travel retail channel that are reflected in Korea in the Asia/Pacific region.  Operating income attributable to the travel retail sales included in Europe, the Middle East & Africa is included in that region and in The Americas."

[8] Estée Lauder's travel retail leadership changed.  On March 7, 2022, Estée Lauder announced that then-Global President, Travel Retail and Retail Development, Olivier Bottrie ("Bottrie"), would exit the Company on June 30, 2022, to retire after twenty-six years.  During Bottrie's tenure, travel retail jumped from 6% of Estée Lauder's net sales in 2004 to 28% in 2021.  Following Bottrie's departure, Israel Assa ("Assa") was appointed to fill the position.  Assa assumed the title of Global President, Travel Retail and Retail Development on May 1, 2022.

this fact.  Indeed, on August 10, 2021, an analyst at Wells Fargo acknowledged that "China is increasingly a driver of EL's global travel retail growth."

75.    In addition, Chinese travel retail also held the important distinction of being the segment where Estée Lauder's largest customer operated.  The Company's largest customer was critically important for the Company and accounted for a massive (and growing) portion of its Companywide net sales.  Specifically, this critical and unnamed customer accounted for 14% of net sales for fiscal 2021, 7% for fiscal 2020, and 5% for fiscal 2019.  Analysts have identified this "largest customer" as China Duty Free Group Company Limited ("CDFG"), a subsidiary of China Tourism Group Duty Free Corporation Limited ("CTGDF"), a Chinese state-owned franchise company authorized by the State Council to carry out nationwide duty-free business in China.  CDFG is the world's number one travel retailer by sales.

76.    In addition to more traditional, international duty-free locations like airports, China's southernmost island province, Hainan, has grown into a massive, Chinese-sponsored domestic duty-free shopping hub.  Hainan Island sits just twelve miles off the coast of the mainland and is easily accessible via various forms of transport, including airplane, train, bus, and ferry service.

77.    Because up to 90% of China's population does not have a passport, travel to domestic locations like Hainan is popular.  In 2011, to boost the local Hainanese (and overall Chinese) economy, the Chinese government introduced the Hainan Duty-Free Policy, which allows Hainan's visitors to purchase duty-free goods domestically at designated shops on the island without having to travel internationally.  At the time it was enacted, the Hainan Duty-Free Policy

allowed the island's tourists to purchase up to 30,000 RMB (currently $4,126.83 USD) worth of goods per person.[9]

78.    Estée Lauder was all in on the opportunity presented by Hainan in the wake of its expanded duty-free purchasing limits.  For example, on February 5, 2021, defendant Freda touted that "within China domestic, Hainan is the star.  And it's driven by the new traffic and by the increased conversion and by the quantities purchased because of the regulations ... and by the development of retail."  Duty-free shopping provided easy access to discounted, but highly demanded, luxury products.

79.    Daigou, which translates from Chinese to English as "buy on behalf of," is also known as surrogate shopping.  Daigou exchanges occur when large quantities of luxury goods are purchased from duty-free stores and resold at a profit to end-consumers in mainland China.  Daigou is controversial because it acts as an end-run around Chinese tax revenue.  It is also publicly condemned by high-end retailers (like Estée Lauder and its competitors) because the mass, discounted sales harm brand image and cannibalize valuable full price sales elsewhere.

80.    After starting in the 2000s, daigou operations have grown increasingly commercial and facilitate their gray market resale through online applications like WeChat and Taobao, which are secure and private.  Such corporate daigou operations are more sophisticated and require massive bulk purchases to be effective because the daigou entity is making its profit off the spread between the duty-free purchase price and the end-consumer price.

81.    As daigou enterprises expanded their underground resale networks, certain locations in Asia became purchasing hubs.  Internationally, South Korea is a common hotspot for

---

[9] On July 6, 2021, industry commentators noted that duty-free store purchasing limits in South Korea were 670,000 won, while in Hainan the new limits were 17 million won.

the daigou industry based on its proximity to mainland China and relatively favorable luxury goods pricing. Domestically, the Chinese island province of Hainan became a haven for daigou while having the distinct advantage of being a domestic island with favorable duty-free policies that allow tourists to purchase luxury goods at lower prices compared to mainland China. Though purchases for daigou gray market resale can occur in any travel retail location, these two geographic locales became hotspots for the daigou industry to bulk purchase duty-free luxury items to be resold on the gray market. Estée Lauder had the ability to control the flow of its products to locations, like Hainan and South Korea, where the daigou industry procured duty-free goods for gray market resale—and the Company did exactly that to meet its sales goals.

82.    On January 1, 2019, China passed the E-Commerce Law of the People's Republic of China (the "ECL"). The ECL required daigou operations to obtain licenses and formally register as businesses. Failure to do so subjected daigou industry participants to fines as high as $291,620 USD for illegal business and tax evasion. Essentially, the ECL sought to impose taxes on daigou participants to disincentivize the practice by cutting into the profits gained by taking advantage of duty-free tax avoidance. Despite these efforts by Chinese authorities, the daigou gray market continued to operate against the backdrop of legitimate travel retail channels, shielded from public view.

83.    Myriad known risks accompanied participating in daigou activity: volatile regulatory landscapes, unpredictable enforcement, geographic overconcentration, trade interruptions, unstable demand, inventory surplus, consumer discount dependency, dilution of brand equity, and loss of price control. For these reasons, luxury brand companies publicly condemned daigou resellers.

84.    For instance, Estée Lauder's direct competitor, Louis Vuitton Moët Hennessy SE ("LVMH"), has publicly emphasized that daigou gray market resale "has a terrible negative effect on the image of the brand" engaging it.  In January 2022, LVMH specifically remarked that brand equity is harmed by the daigou industry, when products go "straight from that store, or rather from the basement[] of that store to retailers in China who sell them at a discount."  The following year, in January 2023, LVMH was again quoted chastising daigou, stating: "[F]or your image, there is nothing worse.  It's dreadful."

85.    Estée Lauder likewise outwardly condemned the practice of daigou to investors and was aware of the threats that the daigou gray market posed to its travel retail business.  On February 5, 2019, in a Company earnings call for the second quarter of 2019, defendant Freda responded to an analyst's question regarding the "impact" of China's ECL on Estée Lauder's travel retail business.  Defendant Freda commented on the "daigou phenomenon" by stating:

> First of all, our travel retail business has not seen the impact from the stricter enforcement through January.  So we don't see the impact so far.  It is also important, however, to remember that *we at Estée Lauder companies have a long-standing policy that limits the numbers of products that a single consumer can buy at any counter in our travel retail globally – since ever*.  So we were never benefiting from a lot of the daigou business because of *our strict policies to avoid any phenomenon like this and, obviously, to limit any risk of gray market around the world*.

86.    Defendant Freda's response to the analyst's inquiry demonstrated both an awareness of the potential impact of governmental regulations relating to the daigou gray market, as well as the Company's internal mechanisms to track and limit the flow of its products into gray market resale.  Estée Lauder's commitment to repudiating gray market resale extends back quite far in the Company's history.  Richard W. Kunes, former CFO, spoke on a Company earnings call on May 3, 2007, about Estée Lauder's "strategic decision to cut back a certain group of retailers in the shipments we were making ... to a very significant degree because we found that there was

a great deal of gray market activity going on from these retailers."  Mr. Kunes not only renounced the gray market—in this instance involving retailers in Spain—but showed the Company's ability to control the flow of Estée Lauder products into the gray market through control of its shipments, noting that "significant quantities of [Estée Lauder's] merchandise was showing up in markets well outside of Spain, well outside of our established distribution and to far greater quantities than we were comfortable with."

87.    Despite Estée Lauder's public vow in 2019 to "limit any risk of gray market around the world," the Company purposefully pumped large amounts of product into the daigou gray market to cover up slow sales growth and became dependent on the level of revenue it generated. Specifically, in 2020, the Company tapped into the back-alley, high-volume sales of the daigou gray market to cover up lagging sales growth resulting from the global COVID-19 pandemic.

88.    Beginning on July 1, 2020, China dramatically expanded duty-free shopping limits to 100,000 RMB ($13,756.10 USD) worth of goods per person in order to stimulate the local economy.  Faced with suppressed travel retail sales and an attractive new duty-free opportunity in Hainan, Estée Lauder used daigou gray market resale to boost sales and quickly became dependent on the gray market to maintain its sales figures.

**The Court in the Related Securities Class Action Found that Daigou Activity Was a Major Driver of Estée Lauder's Sales**

89.    On March 22, 2024, plaintiffs in the Securities Class Action filed an amended complaint.  On March 31, 2025, the court in the Securities Class Action ruled that the Company was reliant on daigou activity in an order denying a motion to dismiss.  In the Securities Class Action complaint, numerous former employees ("FEs") of Estée Lauder confirmed the Company's over-reliance on daigou to grow sales in its travel retail business.

90.     The court in the Securities Class Action ruled that these FEs' statements supported plaintiffs' pleadings that the Company was reliant on daigou.[10]   The court ruled that the former positions of the FEs supported the credibility of their statements.   FE-1 worked as a Regional Marketing Director of Travel Retail for APAC region for two of Estée Lauder's brands from July 2022 to January 2023.[11]   FE-2 worked for Estée Lauder for more than ten years ending in mid-2021.[12]   During that time, FE-2 was a Senior Vice President for a sales region, oversaw demand planning for her region, worked on supply chain and financial planning, and attended financial review meetings for her region.[13]   FE-2 alleged that Estée Lauder had visibility in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners along with the ability to trace where its more expensive products ended up.[14]   FE-3 was in senior leadership in travel retail in the sales region spanning EMEA.[15]   FE-3 a member of senior leadership and her allegations concern the impact of daigou sales on supply allocation decisions across regions and that Estée Lauder had a team dedicated to analyzing daigou sales within the travel-retail group.[16]

91.     Further, the court explained that the Company's own disclosures proves Estée Lauder's reliance on daigou activity.   In a November 1, 2023, disclosure, discussed in more detail

---

[10] *In re The Estée Lauder Co., Inc. Sec. Litig.*, No. 1:23-cv-10669-AS, Opinion and Order at 8 (S.D.N.Y. Mar. 31, 2025) (ECF No. 58) (the "Order").

[11] Order at 9.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 9-10.

below, the Company stated that Estée Lauder's drooping travel-retail sales was "***primarily due*** to our and our retailers' actions to reset retailer inventory levels, and ***changes in government and retailer policies related to unstructured market activity***."  The court in the Securities Class Action reasoned that the disclosure shows that "***daigou sales were a major driver of Estée Lauder's travel-retail sales, and the 2022 crackdown had a strong negative effect on those sales***."[17]

## ESTÉE LAUDER'S LARGEST CUSTOMER AND CHINA'S CRACKDOWN ON DAIGOU IN HAINAN

92.     The Company's ability to rely on the daigou market to drive sales was about to meet an abrupt end.  First, in mid-2021, Estée Lauder's largest customer, CDFG, announced that it would no longer allow any sales into the daigou gray market.  Given the importance of CDFG to the Company's sales and profitability, CDFG's refusal to continue to engage in daigou posed an imminent threat to the Company's ability to rely on this unsustainable sales channel to drive sales growth.

93.     CDFG, which held an estimated 90% to 99% share of the market in Hainan, issued a public statement signaling its solidarity with the Chinese government's efforts to combat gray market resale.  In particular, the CDFG stated:

> In order to enable this engine to exert its strongest momentum and provide tourists with a better shopping experience, ***it is necessary to maintain the healthy ecology of the offshore duty free industry, severely cracking down on purchasing agents and preventing market risks[.]  That has become the unshirkable responsibility of market entities.***

94.     The CDFG cited numerous enforcement actions undertaken by Hainan customs, including "knocking out 80 pirate buying gangs" between July 1, 2020, and July 1, 2021, underscoring the chaos that the daigou industry had brought to Hainan in just one year since the

---

[17] Order at 10.

Hainan Duty-Free Policy was expanded. Analysts at Jefferies Research covering CDFG noted on August 5, 2021, that the "Hainan government has decided to take a stricter approach" when it came to daigou activities. It remarked on the CTGDF's marketing campaigns and traceable QR codes to enforce policies against daigou resale. Analysts commented that, "[t]hese regulatory actions aim to deter Daigou and creates a business environment that respects the rule of law[.]"

95.    A few months later, Hainan publicized impending regulations that echoed the policy positions endorsed earlier in the year by the CDFG. On December 7, 2021, the Office of Free Trade Port Working Committee of the Hainan Provincial Committee published a statement on WeChat announcing new regulations. The Office of Free Trade Port Working Committee of the Hainan Provincial Committee explained that they were designed to "resolutely crack down on illegal daigou and smuggling." The regulations were meant to "have a strong impact on daigou—both individuals involved in purchasing on behalf of others (transferring their tax exemption quota to a daigou company) as well as large-scale daigou companies that resell duty free products in violation of regulations." The formal regulation took effect on January 1, 2022.

96.    By January 1, 2022, the Individual Defendants knew that the valve supplying its inflated travel retail sales—daigou gray market resale—was tightening and about to close. On that date, new regulations in Hainan took effect memorializing ongoing efforts to "crack down" on daigou activities in Hainan to preserve the long-term viability of duty-free sales on the island. Over the course of the next twenty-two months, the Individual Defendants continuously misled the public regarding the cause and extent of its travel retail net sales declines, failing to disclose that the Company had become heavily reliant on the daigou gray market to generate sales within the travel retail segment and that its net sales would decline as a result of no longer being able to

rely on this sales channel to drive sales growth. The Individual Defendants' deception coincided with the Insider Selling Defendants' sales.

## **MATERIALLY FALSE AND MISLEADING STATEMENTS**

97.    Having become dependent on daigou gray market resale by the time the January 1, 2022, Hainan daigou crackdowns took effect, Estée Lauder scrambled to triage the cascading impact of the regulatory crackdowns and the refusal of the Company's biggest customer to engage in daigou business.    In doing so, the Individual Defendants made a series of public misrepresentations and omissions concerning the extent and cause of declining net sales in its travel retail business segment.

98.    On February 3, 2022, the Company filed its Quarterly Report on Form 10-Q for the fiscal second quarter of 2022 ended December 31, 2021 (the "2Q22 Financial Results"), with the SEC, which was signed by defendant Travis.  The 2Q22 Financial Results touted how net sales increased in the travel retail business, stating:

> ***Net sales increased in our travel retail business in both periods, reflecting continued strength of our brands with the Chinese consumer,*** the easing of travel restrictions, which drove increased traffic levels compared to the prior-year periods, and continued success of hero product franchises from La Mer, Origins, Clinique, Jo Malone London and Tom Ford Beauty.

99.    The 2Q22 Financial Results failed to disclose that the reported travel retail net sales increase was generated through daigou gray market resale.  During the quarter (and as was the case for many quarters before that), Estée Lauder's travel retail sales increased because of the Company's heavy reliance on the daigou gray market.  The Individual Defendants concealed Estée Lauder's reliance on daigou to achieve high-volume gray market sales from investors.  The 2Q22 Financial Results also concealed from investors that the Company was overdependent on daigou, an unsustainable sales practice.  Put simply, the statements were false and misleading with respect to the primary driver of Estée Lauder's net sales increases.   The primary driver was not the

"continued strength of our brands with the Chinese consumer" but, in fact, unsustainable and undisclosed daigou sales.

100. The court in the Securities Class Action ruled that the above statement was an "actionable omission."[18]  In particular, the court stated that "Estée Lauder touted the reasons for its success while leaving out the parts of the truth it found inconvenient.  The telling of half-truths—that's what the securities laws don't tolerate."[19]

101. On February 3, 2022, the Company issued a press release for the fiscal second quarter of 2022 ended December 31, 2021 (the "2Q22 Earnings Press Release").  The 2Q22 Earnings Press Release touted increased sales, stating:

> ***Global travel retail sales increased double digits, reflecting continued growth from Asia/Pacific, despite ongoing travel restrictions there during much of the second quarter of fiscal 2022.*** Net sales also grew from Europe, the Middle East & Africa and The Americas as the partial lifting of travel restrictions, specifically in the United Kingdom and the United States, increased traffic and supported the reopening of doors.

102. The above statement was materially false and misleading because the 2Q22 Earnings Press Release attributed second quarter 2022 travel retail sales increases to "continued growth from Asia/Pacific" when sales growth in Estée Lauder's travel retail business were primarily driven by daigou gray market resale in China.  Further, this was an unsustainable practice that defendants previously denied being involved in.

103. On May 3, 2022, the Company held an earnings call discussing Estée Lauder's financial results for the fiscal third quarter of 2022 ended March 31, 2022 (the "3Q22 Earnings Call").  In response to an analyst's question regarding China, defendant Freda stated:

---

[18] Order at 6.

[19] *Id.* at 6-7.

But also, we have seen historically that also the bounce-back can be a very strong, because when this restriction finish, people travel domestically very fast and very happily. ***And so the confidence into Hainan future is unchanged, actually increased given the incredible development of the place*** and the confidence in online is very strong[.]

104.    The above statement was materially false and misleading because defendant Freda projected "confidence" into an "unchanged" future in Hainan, despite knowing that the January 1, 2022, Chinese government and earlier retailer crackdowns on daigou activity significantly altered Estée Lauder's ability to continue depending on gray market resale to drive its travel retail growth. Because the Company had become heavily dependent on the daigou gray market to generate sales growth within the travel retail segment, defendant Freda's statements omitted material information that the Company's net sales would decline as a result of no longer being able to rely on illegitimate daigou sales to drive sales growth following China's 2022 daigou crackdown.    Moreover, defendants Freda's statement on the 3Q22 Earnings Call is materially false and misleading because it attributed "increased" confidence in an "unchanged" future to "incredible development of the place [Hainan]," despite knowing that Estée Lauder's sales in Hainan were primarily driven by daigou gray market resale, an unsustainable sales practice.    The court in the Securities Class Action explained that this is a forward-looking actionable statement because "the speaker offers glimmering predictions about future sales or prospects in China based on misrepresentations of the present-day facts on the ground."[20]

105.    On June 2, 2022, defendant Freda represented the Company at the Bernstein Strategic Decisions conference.    During the conference, defendant Freda touted the results in Hainan while omitting the gray market's effects on the Company's results, stating:

---

[20] Order at 11.

Then I believe that one of the most important opportunities globally in beauty is the development of the Hainan duty-free space, which we believe is just the beginning of the journey.

\*      \*      \*

And that's explained – by the way, ***the incredible results in travel retail*** during the COVID Western lockdowns [were] ***because Hainan was more than substituting the amount of travelers in airports around the world*** just because it was domestic travel duty-free in China. So huge opportunity. This will continue.

106.    Defendant Freda's statement was materially false and misleading because it omitted the Company's reliance on gray market sales.  Further, that these results would end when China cracked down on the daigou.  The court in the Securities Class Action explained that this statement was another "half-truth" because defendant Freda pointed to the volume of travelers but left out daigou.[21]

107.    On August 18, 2022, the Company held an earnings call to discuss Estée Lauder's financial results for the fiscal fourth quarter and year-end of 2022 ended June 30, 2022 (the "4Q22 Earnings Call").  When asked by an analyst about Estée Lauder's underlying market share performance in China as supply returns to normal, defendant Freda responded:

[W]e do expect for the full year, China to go back growing double digit. We expect strong recovery in Hainan in the second part, in the second semester of the fiscal year, for sure, a gradual recovery before. That's our assumption, which obviously is going to give us also results in market share.

\*      \*      \*

We believe the Hainan -- despite the current lockdown, which is obviously painful in the short term, but is a super strong opportunity for the long term, ***the power of Hainan in the future remain[s] intact, and we have strong presence and market share in this operation***.

108.    Defendant Freda's remarks on the 4Q22 Earnings Call failed to disclose the fact that the Company had previously been relying on daigou sales to boost sales but had subsequently

---

[21] Order at 6-7.

lost that ability in describing its "strong presence" and "market share" in Hainan. Estée Lauder's market share grew in Hainan as a result of its dependence on daigou gray market resale and was therefore premised on factors the Company knew were not sustainable. The court in the Securities Class Action explained that this was another forward-looking statement that contained "half-truths."[22]

## THE TRUTH EMERGES GRADUALLY THROUGH A SERIES OF PARTIAL CORRECTIVE DISCLOSURES

109.    Eleven months after the crackdown on daigou began, the Individual Defendants were forced to reveal some of the negative impacts on the Company's business in Hainan. However, the Individual Defendants continued to buoy the Company's stock price by omitting how reliant Estée Lauder was on daigou. On November 2, 2022, Estée Lauder issues a press release for the fiscal first quarter of 2023 ended September 30, 2022 (the "1Q23 Earnings Press Release"). In the 1Q23 Earnings Press Release, the Company reduced its fiscal year outlook for 2023, stating:

> For fiscal 2023, we are lowering our outlook *primarily to reflect tighter inventory management in Asia travel retail*, given reduced traffic as a result of COVID-19 restrictions, tightening of inventory by some retailers in the United States, and a greater negative impact from the far-stronger U.S. dollar. *We anticipate sequential acceleration to strong organic sales and adjusted EPS growth in the second half of our fiscal year as these pressures begin to abate*, momentum continues to build in other areas of our business, and our ongoing investments in innovation and advertising drive growth. Our optimism in the long-term growth opportunities for our brands and for prestige beauty remains intact. Reflecting our confidence, today we raised our quarterly dividend.

110.    The above statement was the first partial corrective disclosure. The 1Q23 Earnings Press Release announcement about the Company's reduction in full year outlook, declining net sales, and pressure and negative impacts on its travel retail business were foreseeable

---

[22] Order at 10.

consequences of, and within the zone of risk concealed by, Individual Defendants' misrepresentations and omissions concerning the Company's net sales in its travel retail business and the cause of the decline in such net sales. Further, the 1Q23 Earnings Press Release announcement partially (but incompletely) revealed some of the relevant truth concealed by the Individual Defendants' prior misstatements and omissions surrounding the Company's travel retail business segment's overdependence on back-alley daigou gray market resale. On this news, Estée Lauder's market capitalization plunged 8.13%, or $16.80 per share, on November 2, 2022, to close at $189.96 per share compared to the closing price of $206.76 per share on November 1, 2022, erasing $3.8 billion in market capitalization.

111.   The 1Q23 Earnings Press Release contained false and misleading statements which misled investors regarding the temporary nature of the poor results. Defendant Freda's statements of reassurance were materially false and misleading insofar as Estée Lauder knew that the Company's ability to rely on daigou to prop up sales in the travel retail segment would not "abate" and would, in fact, continue to impact the Company's sales. Moreover, the references to "strong organic sales" were belied by the fact that Estée Lauder had been—for many years—relying on daigou gray market resale, an unsustainable sales practice that was now formally outlawed by the Chinese government. The court in the Securities Class Action explained that this was another "half-truth" and not "just 'rah-rah' sentiments about the future."[23]

112.   On February 2, 2023, the Company held an earnings call to discuss Estée Lauder's financial results for its fiscal second quarter of 2023 ended December 31, 2022 (the "2Q23 Earnings Call"). During the 2Q23 Earnings Call, defendant Travis was asked about Estée Lauder's supply chain management, specifically as it relates to China. Defendant Travis stated:

---

[23] Order at 10.

[W]e do expect that – we will – two things. One is *inventory levels are still coming down in Hainan*. They are almost at the level that we would expect sales to accelerate. *So yes, we should start to see an inventory build related to the shipments that we expect to see in Q4*. In Korea, again, the pace is a little bit more uncertain given the transitory nature of what's going on right now.

So we do anticipate, as I mentioned in the prepared remarks, that we will start to see resumption of travel in Korea. And depending on the pace of that resumption, that will depend on the amount of shipments that we have in the quarter. But we have taken obviously an assumption there. *We are sitting on a decent amount of inventory even in our own warehouses to supply the sales that we expect to see in the fourth quarter*.

113.    However, the reassurances to investors were false and misleading statements. Defendant Travis's statement in the 2Q23 Earnings Call was materially false and misleading because it omitted how reliant the Company was on daigou.  The court in the Securities Class Action explained that this was yet another forward-looking statement that contained a "present-day half-truth."[24]

114.    That same day, the Company issued a press release for its fiscal second quarter of 2023 ended December 31, 2022 (the "2Q23 Earnings Press Release").  Despite meeting second quarter expectations, the Company again lowered its outlook for fiscal 2023, citing inventory problems and problems in its travel retail markets.  In particular, the 2Q23 Earnings Press Release stated:

For fiscal 2023, we are lowering our outlook given the November and December disruption to travel and staffing levels in Hainan that slowed the expected normalization of inventory and the recently announced potential roll-back of COVID-related supportive measures in Korea duty free. *Together, these are creating a near-term, transitory pressure to our travel retail business*.

\*       \*       \*

The COVID-19 pandemic continued to disrupt the Company's operating environment through the first half of fiscal 2023, including the COVID-related impacts, affecting Asia travel retail, particularly Hainan, and retail traffic in

---

[24] Order at 10.

mainland China. In Asia travel retail, *these challenges led to prolonged store closures as well as the curtailment of travel and caused the tightening of inventory by certain retailers who had previously placed orders in anticipation of the return of travel that was since delayed*.

115.    The 2Q23 Earnings Press Release partially, but incompletely, revealed some of the relevant truth surrounding the Company's travel retail business segment's overdependence on back-alley daigou gray market resale.  On this news, Estée Lauder's market capitalization plunged more than 6.99%, or $19.63 per share, on February 6, 2023, to close at $261.17 per share compared to the closing price of $280.80 per share on November 1, 2023, erasing $4.5 billion in market capitalization.

116.    On May 3, 2023, Estée Lauder issued a press release for its fiscal third quarter of 2023 ended March 31, 2023 (the "3Q23 Earnings Press Release").  Specifically, the Company announced a further reduction of fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets, stating:

> As the shape of recovery from the pandemic for Asia travel retail comes into better focus, it is proving to be both far more volatile than we expected and more gradual relative to what we experienced in other regions. *We are, therefore, lowering our organic sales and EPS outlook for fiscal 2023 to reflect significantly greater headwinds in our fourth quarter than we expected in February*.

117.    The 3Q23 Earnings Press Release further attributed the reduction in guidance to slower recovery from the COVID-19 pandemic.  In particular, the 3Q23 Earnings Press Release stated:

> Asia travel retail business continued to be pressured by the slower than anticipated recovery from the COVID pandemic. Specifically, in Hainan, while traffic into the island exceeded prior year levels, conversion of travelers to consumers in prestige beauty lagged. *This led to the slower than anticipated depletion of elevated levels of retailer inventory and, therefore, lower replenishment orders.*

118.    That same day, the Company held an earnings call (the "3Q23 Earnings Call"). During the call, defendant Travis claimed the tightening of inventory caused the retail business to be pressured, stating:

> *[C]ompounding this pressure is the tightening of inventory by retailers in Hainan. We now expect that a far more gradual return to normal sales growth in Asia travel retail is likely to persist into the first half of fiscal 2024.* In addition, higher inflation and currency volatility, as well as promotions in certain markets to alleviate high stock levels more than offset our price increases and further pressured our business margins.

119.    The 3Q23 Earnings Press Release and Earnings Call partially, but incompletely, revealed some of the relevant truth concealed by the Individual Defendants' prior misstatements and omissions surrounding the Company's travel retail business segment's overdependence on back-alley daigou, gray market resale.  On this news, Estée Lauder's market capitalization plunged more than 18.03%, or $44.22 per share, on May 4, 2023, to close at $201 per share compared to the closing of $245.22 per share on May 2, 2023, erasing $10.2 billion in market capitalization in just two days.

120.    However, the Individual Defendants continued to mislead the public.  During the 3Q23 Earnings Call, defendant Freda buoyed the Company's stock price by claiming that these challenges with travel retail would be abated with time, stating: "Our retail sales growth was even stronger than organic sales growth in many markets around the world, including China and the U.S.  *Encouragingly, retail sales performance is significantly ahead of organic sales results in Global travel retail, which gives us confidence that the challenges in travel retail are abated with time*."  During the same call, defendant Travis also reassured the public that the Company would see a recovery to the challenges in travel retail, stating:

> I think the thing that gives us more comfort now on a more continuous steady progression of recovery is the fact that the COVID restrictions have been lifted. *And so what we were experiencing before with our travel retail business is the volatility related to just some of the COVID restrictions and the flow of traffic in*

*travel and people's comfort with travel, so that gives us more comfort that we're going to see a recovery*.

121.    Defendants Freda's and Travis's statements were materially false and misleading insofar as they attribute "volatility" in Estée Lauder's travel retail business to traffic flows, people's comfort with travel, and COVID restrictions, while omitting the primary driver of travel retail volatility–daigou gray market crackdowns.  The court in the Securities Class Action ruled that this statement "includes an opinion but is nevertheless actionable."[25]  The  court explained that defendant Travis's statement "misleadingly omits one of the decline's other causes, namely 'daigou gray market crackdowns.'"[26]

122.    On August 18, 2023, prior to market close, the relevant truth was further partially revealed when the Company issued a press release for its fiscal fourth quarter and year-end 2023 ended June 30, 2023 (the "4Q23 Earnings Press Release").  Specifically, these results included a substantial decrease in sales stemming largely from the travel retail markets in China and South Korea.  Further, on the associated earnings call held the same day (the "4Q23 Earnings Call"), defendant Freda stated that the retail sales deteriorated following enforcement of daigou activity. In particular, defendant Freda stated:

> Looking ahead, for Asia travel retail, ***the pressure in Hainan intensified over the course of the fourth quarter. In May and June, retail sales trends deteriorated and turned steeply negative following the enforcement actions to control daigou activity***. The implication of these are ***favorable for sustainable, long-term growth, but certainly create significant short-term headwinds through the transition***.

123.    The 4Q23 Earnings Press Release and Earning Call partially, but incompletely, revealed some of the relevant truth concealed by the Individual Defendants' prior misstatements

---

[25] Order at 11.

[26] *Id.* at 12.

and omissions surrounding the Company's travel retail business segment's overdependence on back-alley daigou, gray market resale. The following table compares the Company's ever-decreasing financial forecasts to its actual results:

|  | Disclosure Date | Forecasted Net Sales | Forecasted Diluted Net Earnings Per Common Share | Forecasted Adjusted Diluted Earnings Per Common Share | Forecasted Organic Net Sales |
|---|---|---|---|---|---|
|  | August 18, 2022 | Increase between 3% and 5% | $7.11 - $7.33 | Increase between 5% and 7% | Increase between 7% and 9% |
|  | November 2, 2022 | Decrease between 8% and 6% | $5.01 - $5.21 | Decrease between 21% and 19% | To be flat to increase by 2% |
|  | February 2, 2023 | Decrease between 7% and 5% | $4.25 - $4.44 | Decrease between 29% and 27% | To be down 2% to flat |
|  | May 3, 2023 | Decrease between 12% and 10% | $2.62 - $2.76 | Decrease between 51% and 50% | To decrease between 7% to 5% |
| 2023 Actual Fiscal Results | August 18, 2023 | Decreased 10% | $2.79 | Decreased 49% | Fell 6% |

124.    As the crackdown and restrictions on the daigou market intensified, Estée Lauder faced multiple risks, including deteriorating retail sales trends turning steeply negative following the enforcement actions to control daigou activity. Immediately following the 4Q23 Earnings Press Release, Estée Lauder's market capitalization plunged more than 7.69%, or $12.47 per share, for several days until August 22, 2023, to close at $149.59 per share compared to the closing price of $162.06 per share on August 17, 2023, erasing nearly $2.9 billion in market capitalization in just three days.

125.    Despite this partial disclosure, the Individual Defendants continued to mislead the public. Also, on the 4Q23 Earnings Call, defendant Travis continued to mislead investors, stating:

[A]nd *we have no concerns whatsoever about travel retail growing with traveling consumers*. It's a timing issue for us right now. And so I just want to really underscore that. *It's a pretty -- it's having a timing issue that's having a big short-*

***term temporary impact for us***. But we are not concerned at all about what we have shared with you in the past in terms of our strategy to continue to grow travel retail globally and certainly in all of our markets in Asia.

126.    Defendant Travis's statements on Estée Lauder's 4Q23 Earnings Call were materially false and misleading insofar as they cast China's severe government crackdowns on daigou activity as "a timing issue" with a "big short-term temporary impact."  Far from "short-term headwinds," the "enforcement actions" to control daigou activity flowed from laws implemented by the Chinese government that put an end to Estée Lauder's running spigot of high-volume, gray market travel retail growth.  The court in the Securities Class Action held that the statement on August 18, 2023, was another "half-truth."[27]  The court reasoned that in this statement—similar to the statements made on May 3, 2022, August 18, 2022, November 2, 2022, and February 2, 2023—"defendants attribute current lags in sales to transitory issues like temporary COVID-19 lockdowns, inventory issues, or the strong U.S. dollar while neglecting to mention that the daigou crackdown was a driver of the sales drop."[28]

127.    On November 1, 2023, the truth was fully revealed.  That day, the Company announced its financial results for its fiscal first quarter of 2024 ended September 30, 2023.  As part of these results, the Company disclosed that Estée Lauder's decline in net sales: "[P]rimarily reflect a decline in our Asia travel retail business, ***primarily due*** to our and our retailers' actions to reset retailer inventory levels, and cha***nges in government and retailer policies related to unstructured market activity***, that led to lower product shipments compared to the prior-year period."

---

[27] Order at 10.

[28] *Id.* at 11.

128.    The Company's November 1, 2023, announcements revealed publicly for the first time that the declining sales that Estée Lauder had been attributing for a year to other causes was "primarily due" to government and retailer changes related to "unstructured market activity." Estée Lauder's identification of a "primary" cause for these issues revealed information previously concealed by a litany of parallel problems that were not the root cause of the Company's travel retail sales decline.  Further, Estée Lauder revealed that the promised rapid growth in those markets was still far off.  This disclosure underscored a central point regarding the Company's over-reliance on daigou gray market resale: if daigou activity was not driving Estée Lauder's travel retail sales, changes in government and retailer policies cracking down on such "unstructured market activity" would not be "primarily" responsible when sales plummeted.  On this news, Estée Lauder's market capitalization plunged approximately 19%, or $24.36 per share, on November 1, 2023, to close at $104.51 per share compared to the closing price of $128.87 per share on October 31, 2023, erasing nearly $5.7 billion in market capitalization in just one day.

## REASONS THE STATEMENTS WERE IMPROPER

129.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)    Estée Lauder was over-reliant on gray market sales generated by daigou activity;

(b)    when China cracked down on daigou activity, the Company's sales would materially suffer; and

(c)    as a result of the foregoing, the Individual Defendants had no basis to assuage investors' concerns.

**INSIDER SALES BY THE INSIDER SELLING DEFENDANTS**

130.    Rather than providing the market with correct information, the Insider Selling Defendants, defendants R. Lauder, Freda, Hudis, J. Lauder, Haney, O'Hare, Hyman, Sternlicht, and Barshefsky, used their knowledge of Estée Lauder's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Estée Lauder, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health.  Notably, the sales below were made after China began cracking down on daigou activity.

131.    While in possession of this knowledge, defendant R. Lauder sold 700,000 shares of his personally held Estée Lauder stock for proceeds of nearly $215 million.  His sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price.  Defendant R. Lauder's sales are suspicious given that his stock sales represented over 12% of his holdings during the sales period from February 3, 2022, to October 31, 2023.

132.    While in possession of knowledge concerning the Company's true business health, defendant Freda sold 166,164 shares of his personally held Estée Lauder stock for proceeds of $44.4 million.  His sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price.  Defendant Freda's sales are suspicious given that his stock sales represented over 13% of his holdings during the sales period from February 3, 2022, to October 31, 2023.

133.    Additionally, defendant Freda's sales on March 11, 2022, were shortly after the Company raised the fiscal year 2022 outlook.  Additionally, his August 25, 2022, sale was right after he made a materially false and misleading statement during the 4Q22 Earnings Call regarding the strength of travel retail in Hainan.  Defendant Freda's February 1, 2023, sale is also highly suspicious given that it was the day before the Company made a partial disclosure of the truth which caused a reduction in Estée Lauder's stock price.

134.    While in possession of knowledge concerning the Company's true business health, defendant Hudis sold 68,103 shares of her personally held Estée Lauder stock for proceeds of $14.4 million.  Her sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price.  Defendant Hudis's sales are suspicious given that her stock sales represented 77% of her holdings during the sales period from February 3, 2022, to October 31, 2023.  Additionally, defendant Hudis sold stock on August 25, 2022, right after the fiscal year 2023 outlook was disclosed and when it was the most positive.

135.    While in possession of knowledge concerning the Company's true business health, defendant J. Lauder sold 32,693 shares of her personally held Estée Lauder stock for proceeds of $6.8 million.  Her sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price.

136.    While in possession of knowledge concerning the Company's true business health, defendant Haney sold 24,117 shares of his personally held Estée Lauder stock for proceeds of $6.1 million.  His sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price.  Defendant Haney's sales are suspicious given that his stock sales represented over 71% of his holdings during the sales period from February 3, 2022, to October 31, 2023.  Additionally, defendant Haney sold stock on February 15, 2022, and September 7-9, 2022.  Both periods were right after the fiscal year 2022 and fiscal year 2023 outlooks were disclosed and the most positive.

137.    While in possession of knowledge concerning the Company's true business health, defendant O'Hare sold 18,507 shares of his personally held Estée Lauder stock for proceeds of $5.6 million.  His sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price.  Defendant O'Hare's sales are suspicious given that his stock sales represented almost

66% of his holdings during the sales period from February 3, 2022, to October 31, 2023. Additionally, defendant O'Hare sold stock on February 4, 2022, and September 7, 2022. Both dates were shortly after the fiscal year 2022 and fiscal year 2023 outlooks were disclosed and the most positive.

138.    While in possession of knowledge concerning the Company's true business health, defendant Hyman sold 5,234 shares of her personally held Estée Lauder stock for proceeds of nearly $1.4 million. Her sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price. Defendant Hyman's sales are suspicious given that her stock sales represented over 48% of her holdings during the sales period from February 3, 2022, to October 31, 2023.

139.    While in possession of knowledge concerning the Company's true business health, defendant Sternlicht sold 4,736 shares of his personally held Estée Lauder stock for proceeds of nearly $1.3 million. His sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price. Additionally, defendant Sternlicht sold stock on August 25, 2022, right after the fiscal year 2023 outlook was disclosed and when it was the most positive.

140.    While in possession of knowledge concerning the Company's true business health, defendant Barshefsky sold 2,954 shares of her Estée Lauder stock for proceeds of nearly $550,000. Her sales were timed to maximize profit from Estée Lauder's then artificially inflated stock price.

141.    Notably, all of the Insider Selling Defendants' sales except for defendant Freda's January 23, 2023, and February 1, 2023, sales (listed below) were not made pursuant to a 10b5-1 trading plan. In sum, the Insider Selling Defendants sold over $295 million worth of stock at artificially inflated prices as detailed by the table below:

| Sales Period: February 3, 2022 - October 31, 2023 | | | | |
|---|---|---|---|---|
| Insider Last Name | Transaction Date | Shares | Price | Proceeds |

| | | | | |
|---|---|---|---|---|
| **R. LAUDER** | 2/10/2022 | 700,000 | $307.08 | $214,956,000.00 |
| | | **700,000** | | **$214,956,000.00** |
| | | | | |
| **FREDA** | 3/11/2022 | 38,118 | $264.37 | $10,077,255.66 |
| | 3/11/2022 | 24,046 | $265.30 | $6,379,403.80 |
| | 3/11/2022 | 8,558 | $266.40 | $2,279,851.20 |
| | 3/11/2022 | 14,500 | $267.68 | $3,881,360.00 |
| | 3/11/2022 | 25,714 | $269.20 | $6,922,208.80 |
| | 3/11/2022 | 14,656 | $270.40 | $3,962,982.40 |
| | 3/11/2022 | 2,327 | $271.10 | $630,849.70 |
| | 8/25/2022 | 19,709 | $268.01 | $5,282,209.09 |
| | 1/23/2023 | 11,705 | $270.00 | $3,160,350.00 |
| | 2/1/2023 | 6,831 | $280.00 | $1,912,680.00 |
| | | **166,164** | | **$44,489,150.65** |
| | | | | |
| **HANEY** | 2/15/2022 | 1,152 | $307.94 | $354,746.88 |
| | 5/26/2022 | 1,965 | $237.92 | $467,512.80 |
| | 5/27/2022 | 671 | $253.55 | $170,132.05 |
| | 6/3/2022 | 548 | $263.88 | $144,606.24 |
| | 9/7/2022 | 2,481 | $247.34 | $613,650.54 |
| | 9/9/2022 | 5,109 | $251.86 | $1,286,752.74 |
| | 9/9/2022 | 2,450 | $252.45 | $618,502.50 |
| | 2/13/2023 | 9,741 | $253.90 | $2,473,239.90 |
| | | **24,117** | | **$6,129,143.65** |
| | | | | |
| **O'HARE** | 2/4/2022 | 16,389 | $309.88 | $5,078,623.32 |
| | 9/7/2022 | 2,118 | $247.08 | $523,315.44 |
| | | **18,507** | | **$5,601,938.76** |
| | | | | |
| **J. LAUDER** | 5/4/2022 | 3,600 | $243.68 | $877,248.00 |
| | 5/4/2022 | 5,854 | $244.66 | $1,432,239.64 |
| | 5/4/2022 | 3,429 | $245.76 | $842,711.04 |
| | 5/4/2022 | 6,849 | $246.51 | $1,688,346.99 |
| | 5/4/2022 | 300 | $247.33 | $74,199.00 |
| | 8/23/2023 | 12,661 | $152.75 | $1,933,967.75 |
| | | **32,693** | | **$6,848,712.42** |
| | | | | |
| **HUDIS** | 5/11/2022 | 8,256 | $230.69 | $1,904,576.64 |
| | 8/25/2022 | 3,887 | $274.01 | $1,065,076.87 |
| | 8/25/2022 | 2,780 | $274.70 | $763,666.00 |
| | 5/11/2023 | 43,111 | $202.09 | $8,712,301.99 |
| | 5/11/2023 | 100 | $202.75 | $20,275.00 |

|  | | | | |
|---|---|---|---|---|
|  | 5/11/2023 | 100 | $202.76 | $20,276.00 |
|  | 5/16/2023 | 2,799 | $198.85 | $556,581.15 |
|  | 5/16/2023 | 4,965 | $199.99 | $992,950.35 |
|  | 5/16/2023 | 545 | $200.78 | $109,425.10 |
|  | 5/16/2023 | 1,560 | $201.50 | $314,340.00 |
|  | | **68,103** | | **$14,459,469.10** |
|  | | | | |
| **HYMAN** | 2/3/2023 | 1,000 | $267.07 | $267,070.00 |
|  | 2/3/2023 | 389 | $269.35 | $104,777.15 |
|  | 2/3/2023 | 3,845 | $266.58 | $1,025,000.10 |
|  | | **5,234** | | **$1,396,847.25** |
|  | | | | |
| **STERNLICHT** | 8/25/2022 | 2,700 | $274.01 | $739,827.00 |
|  | 8/25/2022 | 2,036 | $274.71 | $559,309.56 |
|  | | **4,736** | | **$1,299,136.56** |
|  | | | | |
| **BARSHEFSKY** | 5/11/2022 | 1,158 | $238.84 | $276,576.72 |
|  | 8/23/2023 | 1,796 | $151.93 | $272,866.28 |
|  | | **2,954** | | **$549,443.00** |
|  | | | | |
|  | | | | |
|  | | **1,022,508** | | **$295,729,841.39** |

## DAMAGES TO ESTÉE LAUDER

142.    As a result of the Individual Defendants' improprieties, Estée Lauder disseminated improper, public statements concerning supply chain issues and inventory levels.  These improper statements have devastated Estée Lauder's credibility as reflected by the Company's almost $41 billion, or 57.51%, market capitalization loss.  Additionally, the Insider Selling Defendants misappropriated the Company's proprietary material nonpublic information for their personal financial benefit.

143.    Estée Lauder's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Estée Lauder's current and potential customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential.  Businesses are less likely to collaborate with companies that are uncertain about their own financial conditions and companies that are unable to perform and

effectively manage sales without relying on back-alley gray markets. Estée Lauder's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

144.    Further, as a direct and proximate result of the Individual Defendants' actions, Estée Lauder has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)    costs incurred from relying on daigou activity; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Estée Lauder.

145.    On March 31, 2025, the court in the Securities Class Action denied the motion to dismiss. The court focused on the Company's omission of its reliance on daigou sales and how the crackdown on daigou activity would negatively impact travel retail sales. Specifically, daigou sales were "omitted sources of revenue" and that Estée Lauder "touted the reasons for its success while leaving out the parts of the truth it found inconvenient. The telling of half-truths—that's what the securities laws don't tolerate."[29] In denying the motion to dismiss, the court stated that the "complaint alleges that defendants misled investors by omitting mention of Estée Lauder's reliance on daigou altogether."[30] The court's reasoning also gave credibility to the FEs' statements

---

[29] Order at 6-7.

[30] *Id.* at 7-8.

corroborating that Estée Lauder knew how reliant it was on daigou activity because of the FEs' former positions at the Company.[31]   Accordingly, the court ruled that the complaint "plausibly alleges, based on defendants' own disclosures, that daigou sales were a major driver of Estée Lauder's travel-retail sales, and the 2022 crackdown had a strong negative effect on those sales."[32]

146.   The court also pointed out that the plaintiffs sufficiently alleged scienter.[33] Regarding scienter, the court reasoned that the plaintiffs "alleged *a trove of information that would have pointed to daigou*, highlighted public statements by defendants Travis and Freda about daigou and their attentiveness to travel-retail sales data, and alleged that Estée Lauder had a whole team whose purpose was to analyze daigou sales."[34]   The Company has been damaged by this ruling.   Concerning scienter, the court imputed defendants Travis and Freda's intent to the corporation.[35]   As a result, Estée Lauder has been damaged and continues to be damaged by the Individual Defendants' wrongdoing.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

147.   Plaintiff brings this action derivatively in the right and for the benefit of Estée Lauder to redress injuries suffered, and to be suffered, by Estée Lauder as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Estée Lauder is named as a nominal defendant solely in a derivative capacity.

---

[31] *Id.* at 8-9.

[32] *Id.* at 10.

[33] Order at 12-14.

[34] *Id.* at 13.

[35] *Id.* at 14.

148.    Plaintiff will adequately and fairly represent the interests of Estée Lauder in enforcing and prosecuting its rights.

149.    Plaintiff was a stockholder of Estée Lauder at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Estée Lauder stockholder.

150.    The current Board of Estée Lauder consists of the following fourteen individuals: defendants J. Lauder, Hyman, Sternlicht, Barshefsky, W. Lauder, de Rothschild, Fribourg, Zannino, Tejada, Nuñez, and Dong, and non-parties G. Lauder, de La Faverie, and Zinterhofer. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

151.    As explained above, members of the Lauder family are Estée Lauder's controlling stockholders.  Defendants J. Lauder and R. Lauder received a material personal benefit and face a substantial likelihood of liability for reaping almost $220 million in their sales of the Company's stock at a time when defendants J. Lauder and R. Lauder knew Estée Lauder's stock price was inflated.

152.    Defendants Hyman, Sternlicht, and Barshefsky received a material personal benefit and face a substantial likelihood of liability for reaping over $3.2 million in Company stock sales when defendants Hyman, Sternlicht, and Barshefsky knew Estée Lauder's stock price was inflated.

153.    Moreover, all of the Director Defendants breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding supply chain issues and inventory levels.

154.    Defendant W. Lauder and non-party G. Lauder would be hard pressed to independently investigate and prosecute their uncle, defendant R. Lauder, and their cousin, defendant J. Lauder, for insider trading.

155.    Defendant W. Lauder and non-parties G. Lauder and de La Faverie would not be able to assess defendants Barshefsky's, Hyman's, and Sternlicht's sales without also investigating and bringing to attention defendants J. Lauder's and R. Lauder's sales.  Additionally, defendants J. Lauder, Barshefsky, Hyman, and Sternlicht would not be able to assess each other's sales without also investigating and bringing attention to their own sales.

156.    In addition to the above, the principal professional occupation of non-party de La Faverie is his employment with Estée Lauder, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Accordingly, non-party de La Faverie lacks independence from defendants J. Lauder, R. Lauder, and W. Lauder and non-party G. Lauder due to his interest in maintaining his executive position**s** at Estée Lauder.  This lack of independence renders non-party de La Faverie incapable of impartially considering a demand to commence and vigorously prosecute this action.

157.    According to Estée Lauder's Current Report on Form 8-K filed with the SEC on November 1, 2024, announcing non-party de La Faverie as CEO, the Company pays non-party de La Faverie a substantial amount of compensation.  Effective January 1, 2025, his base salary will be at an annual rate of $1.5 million and his aggregate bonus opportunity at target will be $3 million, which, for fiscal 2025, will be prorated based on his time in the role of President and CEO. Additionally, he will receive a one-time cash payment of $25,000.  As President and CEO, non-party de La Faverie's annual equity-award target opportunity will have a value of no less than $10 million (before application of his individual performance adjustment).  For fiscal 2025, non-party

de La Faverie's total equity-award target opportunity will be prorated based on his time in the role of President and CEO, for a total prorated grant value of $6,740,500, which includes an additional grant with value of $3,259,500, subject to approval by the Stock Plan Subcommittee.  Non-party de La Faverie will be eligible to participate in the Company's Profit Recovery and Growth Plan incentive program for fiscal years 2025 and 2026 at a target opportunity of 25% of his annual equity-based compensation award target opportunity, up to a maximum of 50%, the achievement of which could result in a grant of restricted stock units in August 2025 and August 2026.

158.    Accordingly, non-party de La Faverie is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.

159.    The Lauder family also shares business and personal connections with defendant de Rothschild.  The Council for Inclusive Capitalism (the "Council"), a global not-for-profit organization that partners with CEOs and organizations to create profitable actions aimed at the private sector, employs defendants W. Lauder and de Rothschild.  Defendant de Rothschild co-founded the Council and has served as Co-Chair since 2000.

160.    The de Rothschilds and the Lauders have been connected for years, beyond professional ties.  Their connection often causes them to attend similar events and interact in the same social circles.  For instance, in 2002, defendants de Rothschild and L. Lauder both attended the New York charity gala:[36]

---

[36] Woods, "The Multimillion-Dollar Question – Can We Really Have It All? Self-Made Magnate Lynn Forester De Rothschild on ever Working Mother's Dilemma," Photo, DailyMail.com (Oct. 19, 2013), https://www.dailymail.co.uk/home/you/article-2464672/The-multimillion-dollar-question--really-Self-magnate-Lynn-Forester-De-Rothschild-working-mothers-dilemma.html.



At a New York charity gala with Estée Lauder bosses Leonard and Evelyn Lauder in 2002

161. As Chair of the American Patrons of Tate in 2007, defendant de Rothschild secured English Prime Minister Tony Blair's support for the foundation. In turn, Prime Minister Blair offered to host a gala dinner where defendant R. Lauder, along with two other Modern Museum of Art trustees, purchased a table at the event for $50,000.

162. In April 2010, defendants de Rothschild and L. Lauder both attended the CANCER RESEARCH INSTITUTE'S "Through The Kitchen" Party at The Four Seasons:[37]

---

[37] Photo, Will Ragozzino/Patrick McMullan via Getty Images (Apr. 25, 2010), https://www.gettyimages.com/detail/news-photo/lady-lynn-de-rothschild-and-leonard-lauder-attend-cancer-news-photo/818781446?



163.    In September 2010, defendants de Rothschild and L. Lauder both attended the

Alzheimer's Drug Discovery Foundation Inaugural Foundation Luncheon at The Pierre Hotel on

September 22, 2010, in New York City:[38]

---

[38] Photo, Jackie Snow/Patrick McMullan via Getty Images (Sept. 22, 2010), https://www. gettyimages.no/detail/news-photo/lynn-de-rothschild-leonard-lauder-and-paula-root-attend-news-photo/818057974?



164.    Non-party G. Lauder serves on the Alzheimer's Drug Discovery Foundation's Board of Governors while defendant R. Lauder is the Co-Founder and Co-Chairman.

165.    In 2012, defendant de Rothschild hosted a fundraiser at her Manhattan home in support of third-party candidate, Jon Huntsman.  A part of this fundraiser was the host committee, consisting of multiple wealthy donors, including defendants W. Lauder and Sternlicht.

166.    On October 6, 2014, Sir Evelyn de Rothschild attended the launch of The Estée Lauder Companies' UK Breast Cancer Awareness Campaign 2014 at Kensington Palace.

167.    In 2015, Nicky Hilton de Rothschild, who has launched clothing, jewelry, and cosmetic lines, collaborated with Smashbox in 2015.  Smashbox is a cosmetic brand owned by Estée Lauder.

168.    In November 2015, a member of the de Rothschild family and defendant R. Lauder represented the World Jewish Congress when Pope Francis was planning to visit Rome's Great Synagogue:[39]



*Photo (left to right): WJC Governing Board Chairman David de Rothschild, WJC President Ronald S. Lauder, Pope Francis, WJC Treasurer Chella Safra, President of Latin American Jewish Congress Jack Terpins, WJC CEO Robert Singer and Executive Director of the Latin American Jewish Congress Claudio Epelman.*

169.    In 2017, non-party G. Lauder and defendant de Rothschild both attended the Alzheimer's Drug Discovery Foundation Eleventh Annual Connoisseur's Dinner at Sotheby's on May 10, 2017, in New York City:[40]

---

[39] News Release, "Pope Francis to Make First Official Visit to Rome's Great Synagogue," Photo, World Jewish Congress (Nov. 17, 2015), https://www.worldjewishcongress.org/en/news/pope-francis-to-make-first-official-visit-to-rome.

[40] From left to right: non-party G. Lauder, defendant de Rothschild, and Evelyn de Rothschild, defendant Rothschild's husband; Photo, Patrick McMullan/Patrick McMullan via Getty Images (May 10, 2017),.https://www.gettyimages.ch/detail/nachrichtenfoto/gary-lauder-lynn-de-rothschild-and-evelyn-de-nachrichtenfoto/681686180?language=it.



170.    Defendant L. Lauder was also present at the event:[41]



[41] Photo, Mike Coppola/Getty Images (May 10, 2017), https://www.gettyimages.no/detail/news-photo/chairman-emeritus-of-the-estee-lauder-companies-inc-leonard-news-photo/681707188?

171.    Then, in 2018, defendant R. Lauder, as the World Jewish Congress President, presented the de Rothschild family with the prestigious WJC Theodor Herzl Award, which recognizes outstanding individuals who work to promote Herzl's ideals for a safer, more tolerant world for the Jewish people.  Defendant R. Lauder stated about the Rothschild family, "[i]nstead of honoring a single individual, we are honoring one family, the Rothschilds, who have rarely been recognized publicly for all they have done….  There is, however, one family that stands above all others—the Rothschild family—who laid the very foundation of the Jewish homeland."

172.    Also in 2018, defendant de Rothschild and Sir Evelyn de Rothschild donated between $10,000 and $24,999 to The Fresh Air Fund.  This donation overlapped with defendant W. Lauder's tenure as Chairman of The Fresh Air Fund.

173.    The National Gallery, where Hannah de Rothschild previously sat as Chair of Board of Trustees until 2019, listed defendant R. Lauder as a Director's Circle-level donor and notes his contribution to Gallery, including several art purchases in 2018.

174.    On September 22, 2023, Aerin Lauder and Nicky Hilton de Rothschild are pictured together at the Golden Swan in New York City as a part of a launch party to celebrate the New Estée Lauder x Gracie Collaboration:[42]

---

[42] Photo, Joe Schildhorn/BFA.com (Sept. 22, 2023), https://bfa.com/home/photo/5835417?collection-fk=41440&page=1.



175.    Aerin Lauder and Nicky Hilton de Rothschild were among several Co-Chairs of the 2022 Golden Heart Awards, a gala accompanied by cocktails, dinner, awards, and an auction.

176.    In October 2023, the McCain Institute hosted a dinner in New York City where defendants de Rothschild and R. Lauder were attendees.  The Leonard and Judy Lauder Fund and The Lauder Foundation—Leonard and Evelyn Lauder Fund each donated between $25,000 and $99,999 to the McCain Institute annually since at least October 2021, totaling at least $150,000. These donations overlap with defendant de Rothschild's tenure as a member of the Institute's international leadership board.

177.    In sum, defendant de Rothschild could not independently assess insider trading allegations against defendants R. Lauder and J. Lauder given the two families' long and deep connections.  Similarly, defendant de Rothschild would not be able to independently assess insider trading allegations against any of the other Insider Selling Defendants because it would only bring attention to defendants R. Lauder's and J. Lauder's sales.

178.    Defendants Fribourg, Zannino, Tejada, Hyman, Nuñez, and Dong, as members of the Audit Committee, reviewed and approved the improper statements.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

## COUNT I

**Against Defendants W. Lauder, R. Lauder, J. Lauder, and L. Lauder, in Their Capacity as Estée Lauder's Controlling Stockholders, for Breach of Fiduciary Duty**

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180.    As explained herein, defendants W. Lauder, R. Lauder, J. Lauder, L. Lauder, and non-party G. Lauder are Estée Lauder's controlling stockholders.  As controlling stockholders, defendants W. Lauder, R. Lauder, J. Lauder, and L. Lauder owed and owe the Company the utmost fiduciary duties of due care, good faith, and loyalty.

181.    Defendants W. Lauder, R. Lauder, J. Lauder, and L. Lauder knew that the Company's sales would decline as a result of China's crackdown on daigou activity.  They also knew that such information was material and would negatively impact the Company's stock price once it became public.

182.     Despite being in possession of this material nonpublic information, defendants R. Lauder and J. Lauder unloaded 732,693 shares of Estée Lauder stock on the unsuspecting public, generating more than $221 million in gross proceeds in violation of their fiduciary duties. Defendants W. Lauder and L. Lauder knew that defendants R. Lauder and J. Lauder had breached their fiduciary duties.

183.     Defendants R. Lauder and J. Lauder improperly benefited from their breaches of their fiduciary duties.

184.     Plaintiff, on behalf of Estée Lauder, has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants in Their Capacities as Directors or
Officers of the Company for Breach of Fiduciary Duty**

185.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.     The Individual Defendants owed and owe Estée Lauder fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Estée Lauder the highest obligation of loyalty and care.

187.     The Individual Defendants and each of them, violated and breached their fiduciary duties.

188.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that the Company's statements concerning travel retail were materially false and misleading.  Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

189.    The Director Defendants, as directors of the Company, owed Estée Lauder the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's materially false and misleading statements.  The Director Defendants knew or were reckless in not knowing that the statements concerning travel retail were materially false and misleading because of the Company's over-reliance on gray market sales.  Accordingly, these defendants breached their duty of loyalty to the Company.

190.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

191.    The Insider Selling Defendants breached their duty of loyalty by selling Estée Lauder stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was material, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Estée Lauder common stock.

192.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Estée Lauder has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

193.    Plaintiff, on behalf of Estée Lauder, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

194.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

195.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Estée Lauder.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Estée Lauder.

196.    The Insider Selling Defendants sold over $295 million of Estée Lauder stock while in possession of adverse material, nonpublic information that artificially inflated the price of Estée Lauder stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

197.    Plaintiff, as a stockholder and representative of Estée Lauder, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

198.    Plaintiff, on behalf of Estée Lauder, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Estée Lauder, demands judgment as follows:

A.    Determining that this action is a proper derivative action, that demand is excused, and certifying plaintiff as an appropriate representative of the Company for this action;

B.    Finding that each of the Lauder-family defendants breached their fiduciary duties as controlling stockholders of the Company;

C.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

D.      Directing each of the Individual Defendants to account to Estée Lauder for any damages sustained or to be sustained by the Company and all profits, gains, and benefits obtained by Individual Defendants by reason of the wrongs alleged herein and awarding the Company all such damages against Individual Defendants;

E.      Directing each of the Individual Defendants to pay pre- and post-judgment interest at the highest rate allowable by law on the amount of damages awarded to the Company because of Individual Defendants' actions as described herein;

F.      Directing Estée Lauder to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Estée Lauder and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a provision to control insider selling;

2.      a proposal to strengthen Estée Lauder's oversight of its disclosure procedures;

3.      a proposal to strengthen the Company's controls over financial reporting;

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.    a provision to permit the stockholders of Estée Lauder to nominate at least three candidates for election to the Board;

G.    Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Estée Lauder has an effective remedy;

H.    Awarding to Estée Lauder restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by the Insider Selling Defendants;

I.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  May 8, 2025

**LEVI & KORSINSKY, LLP**

/s/ *Correy A. Suk*
Gregory M. Nespole
Daniel Tepper
Correy A. Suk
Sidharth Kakkar
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
E-mail: gnespole@zlk.com
          dtepper@zlk.com
          csuk@zlk.com
          skakkar@zlk.com

**ROBBINS LLP**
Brian J. Robbins (*pro hac vice* forthcoming)
Craig W. Smith (*pro hac vice* forthcoming)
Shane P. Sanders (*pro hac vice* forthcoming)
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
          csmith@robbinsllp.com
          ssanders@robbinsllp.com

*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Matthew Van Winkle, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 4/30/2025 _____

Signed by:

_____
MATTHEW VAN WINKLE